Kenneth FRANCO, M.D., Plaintiff,

v.

YALE UNIVERSITY, in its own capacity and acting through the Yale University School of Medicine, John Elefteriades, M.D., Gary Kopf, M.D.; and Ronald Merrell, M.D., Defendants.

No. 3:00CV1927(GLG).

United States District Court, D. Connecticut.

Aug. 10, 2001.

Richard A. Cerrato, Bridgeport, CT, Jeffrey M. Duban, New York City, for plaintiff.

Kevin C. Shea, William H. Clendenen, Jr., New Haven, CT, Patrick M. Noonan, Brock Thomas Dubin, Delaney, Zemetis, Donahue, Durham & Noonan, Guilford, CT, for defendants.

## MEMORANDUM DECISION

GOETTEL, District Judge.

This case involves a doctor who is having difficulty remedying a disease which he finds difficult to diagnose. The defendants move to dismiss the Amended Complaint.

The Amended Complaint, in stark disregard of Federal Rule of Civil Procedure 8(a)(2) (stating that the Complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief"), contains some ninety-two paragraphs running twenty-three pages. We will attempt to summarize this opus.

After the jurisdictional and venue allegations (which are not contested), the plaintiff sets forth his training as a cardiothoracic surgeon and his experience. Paragraph 8 of the Complaint notes that the plaintiff "reasonably anticipated being able to work productively and profitably in his chosen profession, support his family in a way reflecting his accomplishments, and compensate from age 36 onward for the protracted years of training and residency at meager rates of compensation." The Complaint then sets forth the three appointments which the plaintiff had at the Yale University School of Medicine ("School of Medicine" or "Medical School"). The Complaint also notes that the School of Medicine is located in the Yale–New Haven Hospital but that neither Yale University nor the Medical School owns, operates, or controls the Hospital which was the primary facility for surgical

procedures performed by Medical School physicians and outside community physicians. (The significance of this distinction will be noted subsequently.) The Complaint then describes the three individual doctor defendants as being "Yale employees in the section of Cardiothoracic surgery." [1]

The Complaint then describes the plaintiff's three full-time appointments at the School of Medicine, the first two for a three year period and the third for a five year period, which would have expired on June 30, 1999 but was extended by the School of Medicine for another six months (at half pay) at the plaintiff's urgent request. The Complaint also states that "[a]side from written designations of salary and other emoluments, the terms and conditions and mutual promises and obligations of Dr. Franco's employment were not memorialized." (Compl. ¶ 13.) The next paragraph of the Complaint alleges that the terms and conditions were "comprised of, and understood to be, matters of professional custom and usage ...." (Compl. ¶ 14.)

The Complaint then launches into a twelve page description of internal political battles in the cardiology section of the Hospital between community physicians (i.e., private surgeons) headed by the individually named defendant doctors, and alleges that the individual defendants did not refer cases to the plaintiff, and that the doctors in the cardiology group engaged in private practice at significantly higher levels of compensation than they would have been earned as academic members of the cardiology department. The last named individual defendant, Dr. Ronald Merrill, became Chair of the Cardiology Department in 1993. The Complaint alleges that

1. Despite the allegation that the defendant doctors were employees, the subsequent allegations of the Complaint make it appear that

they were in fact private physicians who held positions at the Hospital and accordingly were extended privileges to practice there.

Merrill was generally not accepted by the senior faculty of the School of Medicine who believed that "he was in the service of [the Hospital] advancing private physician interests over those of the Medical School faculty." (Compl.¶ 23.) The Complaint further alleges that the first named individual defendant, Dr. Elefteriades, became Section Chief of Cardiology[2] in 1995 and shortly thereafter informed the plaintiff that "we do not anticipate offering reappointment at the expiration [on June 30, 1999] of your present term of appointment." (Compl.¶ 29.) Plaintiff also alleges that Dr. Elefteriades "adduced bogus charges of inadequate performance and lack of productivity" on the part of the plaintiff. (Compl.¶ 30.) The Complaint further alleges that, starting in 1995, the referral of surgical cases to the plaintiff decreased and that Yale administrators condoned this situation. The Complaint continues that the plaintiff's salary declined from $260,000 in 1993 and 1994 to $188,000 during his last few years at the Hospital, and that as a result, the plaintiff "spent his life savings and all tax rebates and incurred significant debt."[3] (Compl.¶ 36.)

The Complaint then goes into great detail concerning the formation of Cardiothoracic Surgical Associates, P.C. ("the Group") which was to become the primary clinical practice vehicle of the section within the School of Medicine. Formation of the Group integrated two cardiothoracic surgery practices to create the first combined Yale and privately based surgical group in the New Haven area. The Complaint does not tell us precisely how many doctors were a part of the Group, but does mention that the letterhead listed six doctors who were shareholders in the Group. (Another allegation of the Complaint indicates that there were more than thirty doctors in the section). The six listed doctors included Dr. Elefteriades and Dr. Kopf, another named individual defendant. Plaintiff asserts that Yale allowed this "Group" to form because those doctors would otherwise have left the Medical School, taking their patients and referrals elsewhere. Plaintiff also asserts that the remainder of doctors in this section, who were not members of the Group, were to function as an independent cost center responsible for meeting its own expenses and generating its own revenues. The "Group" had no responsibility for the clinical practice or other activities or expenses of the remainder of the section. This, according to the Complaint, amounted to Yale "willfully and arbitrarily disenfranchis[ing] the 'remainder of the Section.'" (Compl.¶ 44.) The Complaint alleges that this was financially very beneficial to members of the Group but caused financial loss to the other surgeons from the Medical School.

The Complaint then sets forth six paragraphs concerning other indignities that the plaintiff contends he suffered at the Hospital under the heading "Continuing Actions Adverse to Dr. Franco." The next twelve paragraphs concern the plaintiff's efforts to relocate to another institution and the claim that the plaintiff did not get support in his relocation efforts from the defendants, and that this "contravened professional protocol, custom and usage, [and] was purposeful and malicious ...." (Compl.¶ 58.) Plaintiff claims that the defendant doctors "maliciously impeded Dr.

---

**2.** We gather that private physicians having privileges at the teaching hospital are given academic titles since plaintiff's letter of September 25, 1995 to Dr. Elefteriades addresses him as "Professor and Chief."

**3.** We cannot resist noting that this terribly penurious salary is substantially more than federal judges are paid.

Franco's relocation efforts by disparaging and defaming Dr. Franco in his profession to prospective employers." (Compl.¶ 60.) We assume by the foregoing allegations that the plaintiff means they did not give him a favorable recommendation, which conforms to their earlier opinions about him.

The Complaint then re-alleges that during his last four years at the Hospital as a result of the foregoing, the plaintiff "was in danger of mortgage and other loan defaults and was living with his family on a stringent budget, entirely inappropriate to an Associate Professor of Surgery at the Medical School." (Compl.¶ 64.) The Complaint then states that at the conclusion of his extended appointment, the plaintiff secured a position at Nebraska University School of Medicine. (*See infra* note 10 regarding his increase in salary.) Finally, on Page 17 of the Complaint, we reach the claims asserted in this action.

The first claim is for breach of contract and, of course, realleges the preceding 16 pages of the Complaint. It states that plaintiff and Yale were required to observe and comply with the terms and conditions and mutual promises and obligations of their employment agreement. As to what these terms and conditions were, Paragraph 69 alleges them to be "matters of professional custom and usage reflecting the shared professional training, experience, expectation and purpose" of the parties at the time of hiring.[4] The Complaint again refers to the formation of the "Group" which plaintiff alleges was not in his interest and that Yale "failed to act so as to avoid injuring or impairing plaintiff's

right to receive the benefits of his employment and employment agreement." (Compl.¶ 73.)

The next claim is one for "constructive discharge." Plaintiff alleges that Dr. Elefteriades's 1995 letter informing the plaintiff that he would not be reappointed in 1999 and the formation of the Group "excluded plaintiff from meaningful professional participation, remuneration or advancement in the Medical School, with the purpose and result of harassing, embarrassing, demoralizing and stymieing plaintiff in his profession, if not with the purpose of destroying his career and livelihood." (Compl.¶ 76.) As a result of the foregoing, the Complaint seeks $5,000,000 in compensatory damages and not less than $10,000,000 in punitive damages for this purported "constructive discharge." The third and fourth causes of action are the now commonly appended claims for intentional and negligent infliction of emotional distress. These two claims reallege the first 67 paragraphs of the Complaint but, except for conclusory allegations of outrageous behavior, do not allege anything additional in the way of specific conduct.

The "Wherefore" clause demands judgment solely against Yale University "in its own capacity and acting through the Medical School and its employees." No demand is made of the "Group" nor against the three doctors who are either a part of the Group or were instrumental in its formation.[5]

### *Breach of Contract Claim*

The defendant moves to dismiss the breach of contract claim, arguing principal-

4. We gather that this allegation is meant to assert the claim that when one is hired as a medical school professor, one will stay hired indefinitely and be repeatedly promoted to higher positions.

5. The original Complaint named no individual defendants, just 20 John Doe's. After this Court granted a motion for a more specific statement of a complaint, the Amended Complaint was served and named the three individual doctors whose names now appear in the caption.

ly that the plaintiff failed to follow the provisions of the Yale Faculty Handbook by requesting internal review. The handbook does have a detailed grievance process for adjudicating employment disputes between professors and their departments. It has become a not uncommon practice in recent years for employees at will to claim the existence of an employment contract based on an employment handbook. If plaintiff made such a claim, he would clearly be required to have followed the provisions of the handbook. However, the plaintiff explicitly eschews any claim that he has a contract based upon the handbook. Indeed, he points out that the handbook is nowhere mentioned in his complaint.

The defendant interprets the Complaint as alleging a claim for wrongful termination of his contract and for improper diminution of his salary during his years of employment. Defendant argues that since plaintiff was not fired, he has failed to allege an essential element for wrongful discharge in violation of the covenant of good faith and fair dealing. In his opposing papers, plaintiff acknowledges that he was not fired. The Complaint seems to focus on events that occurred during the period that he was working for the University. To the extent relief as to such allegations is sought, it would be barred by the failure to follow the grievance procedures of the University.

■ However, as we read the Complaint, although it complains of the diminution of salary from the University and the failure to reappoint him, neither of these seems to be matters as to which damages are sought. If the plaintiff subsequently at trial attempts to seek damages based on the failure to reappoint him or reductions in salary while he was employed, we hold that the failure to exhaust the internal remedies bars such claims. We do not,

however, accept the defendant's argument that the failure to exhaust remedies available with the University deprives this Court of subject matter jurisdiction. As we read the Complaint, and as is emphasized in the plaintiff's Memorandum of Law in Opposition, it is the formation of the "Group" which is the centerpiece of the Complaint and the major focus of the plaintiff's claim for damages.

The plaintiff makes a number of arguments why, in any event, he should not be required to have followed the handbook grievance policy. Most of those arguments are completely unavailing. However, he makes the point that the grievance procedure is not directed toward things such as the formation of the "Group." Indeed, the handbook applies to University policies that have "not been properly observed in the case of his or her reappointment or promotion, that his or her reappointment or promotion has not been adequately considered ...." Yale University Faculty Handbook (Jan. 1993), § L3A.

The defendant further argues that to the extent the plaintiff claims breach of an express contract, the Complaint has not identified any term of the subject contract breached by the defendant. That is true. As to the failure to identify a term of the contract breached by the defendant, the plaintiff's argument is that the "claim of good faith breach, however, is not 'term'-specific, but addressed to Yale's overall conduct." (Pl.'s Opp. Mem. at 36.) The plaintiff argues that he had a contract, namely his appointment as a medical school professor, but that the terms of the contract were only as to salary and emoluments and that the remainder of the contract was implied and based upon professional custom and usage.

■ The defendant argues that in the absence of a contract, the plaintiff cannot

sustain a claim for a breach of the implied covenant of good faith and fair dealing. However, the final five-year appointment has sufficient contractual aspects to support a claim for breach of an implied covenant of good faith and fair dealing, at least to the extent that the claim refers to events that occurred during those five plus years.

■■■■ We do not mean to suggest that the formation of the Group by the private physicians with privileges at the Hospital, with the cooperation of certain of the Medical School doctors, necessarily states a cause of action. We are aware, from another Hospital case recently tried before us, that the formation of groups to privatize the practice of medicine at hospitals is not a unique situation.[6] Apparently, the plaintiff's major complaint is that the University disenfranchised "the remainder of the section" by allowing the formation of a group which dominated the assignment of surgical cases. The reorganization also allegedly required doctors not in the Group to meet their own expenses and generate their own revenues. The plaintiff argues that it was not so much that he had been terminated, "as it was the then existing division of Cardiothoracic surgery which was being dismantled." (Pl.'s Opp. Mem. at 29.) Whether this action violated an implied in fact aspect of the contract of employment cannot be decided simply on a motion to dismiss, in light of the relevant standard of review.[7] It may, of course, be reconsidered after discovery, if a motion

for summary judgment is filed. However, even on a summary judgment motion, determination of the extent of a doctor's privileges under a disputed contract may involve a material issue of act. *Richter v. Danbury Hosp.*, 60 Conn.App. 280, 289–90, 759 A.2d 106 (2000).

Accordingly, we deny the motion to dismiss the breach of contract claim.

### Constructive Discharge

■■■ The cause of action for a constructive discharge is much easier to deal with. Initially, we note that there would have to have been some type of "discharge." The plaintiff does not claim to have been discharged. Moreover, to constitute constructive discharge, the plaintiff would have had to resign his position involuntarily based on the employer's intentional creation of an intolerable work atmosphere, thereby forcing the employee to quit. This plaintiff did not resign. Indeed, plaintiff's opposition states that it was not a feasible option for the plaintiff to resign. He sought and received an extension of his final appointment. These facts alone are sufficient to defeat the claim of constructive discharge.

Moreover, any allegations that the plaintiff's working conditions were so intolerable as to compel a resignation, had there been one, are inadequate. Consequently, we grant the motion to dismiss the second cause of action.

---

**6.** Apparently such private groups can bill for higher rates under Medicare and Medicaid then can hospital employees. In addition, the hospital frees itself from the necessity of paying salaries to members of the group. Finally, there may be tax benefits in the formation of such a group.

**7.** In considering a motion to dismiss, a court must accept as true the factual allegations of

the complaint and draw all reasonable inferences in favor of the plaintiff. The Court cannot grant a motion to dismiss for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief. *Bolt Elec., Inc., v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995).

### Intentional and Negligent Infliction of Emotional Distress

We consider both claims of infliction of emotional distress (intentional and negligent) together, since for certain material purposes (noted below), the considerations are the same. There are virtually no allegations of affirmative acts by Yale inflicting injury on plaintiff. Rather, Plaintiff accuse Yale of failing to stop the private surgeons from forming the Group and for not overruling the Hospital's Section Chief's decision not to reappoint plaintiff. These allegations might suggest a claim of negligence, but not intentional acts.

### Infliction of emotional distress claims in employment context unrelated to termination process

At the outset, we note that there is considerable doubt as to whether the plaintiff can assert claims of negligent infliction concerning events that occurred during his period of employment. This Court has addressed this very issue on a number of occasions and has adhered to the holding of the Connecticut Supreme Court in *Parsons v. United Technologies Corp.*, 243 Conn. 66, 700 A.2d 655 (1997), that "negligent infliction of emotional distress in the employment context arises *only* where it is based upon unreasonable conduct of the defendant in the termination process." *Id.* at 88, 700 A.2d 655 (emphasis added, internal citations and quotations omitted). *See, e.g., Abate v. Circuit–Wise, Inc.*, 130 F.Supp.2d 341, 346 (D.Conn.2001); *Roberts v. Circuit–Wise, Inc.*, 142 F.Supp.2d 211, 216 (D.Conn.2001); *Cameron v. St. Francis Hosp. & Med. Ctr.*, 56 F.Supp.2d 235, 240 (D.Conn.1999). We have also observed that the Second Circuit, in dictum, has expressed doubt as to whether the Connecticut Supreme Court would continue to limit the tort of negligent infliction of emotional distress to actions taken in the course of an employee's termination. *See Malik v. Carrier Corp.*, 202 F.3d 97, 103–04 n. 1 (2d Cir.2000).

Our most recent review of the Connecticut State court cases indicates that a decisive majority has continued to adhere to the requirement of a termination in order for a plaintiff to assert a claim for negligent infliction of emotional distress in the employment context. *See, e.g., Troy v. Precision Computer Servs., Inc.*, No. CV00082592, 2001 WL 589114, at *3 (Conn.Super.Ct. May 14, 2001); *English v. Hebrew Home & Hosp., Inc.*, No. CV990588990S, 2001 WL 617209 (Conn.Super.Ct. May 14, 2001); *Odell v. Episcopal Diocese of Conn.*, No. CV990592395S, 2000 WL 1227318, at *3 (Conn.Super.Ct. Aug. 9, 2000); *Ferraro v. Stop & Shop Supermarket Co.*, No. CV960388031S, 2000 WL 768525, at *3 (Conn.Super.Ct. May 25, 2000); *Dollard v. Orange Bd. of Educ.*, No. CV99–067338, 2000 WL 192804, at *1 (Conn.Super.Ct. Feb. 2, 2000); *Austin v. Sonitrol Communications Corp.*, No. CV990589116S, 1999 WL 1241927, at *1 (Conn.Super.Ct. Dec. 3, 1999); *Thompson v. Bridgeport Hosp.*, No. CV980352686, 1999 WL 1212310, at *4 (Conn.Super.Ct. Nov. 17, 1999); *Hart v. Knights of Columbus*, No. CV980417112S, 1999 WL 682046, at *4 (Conn.Super.Ct. Aug. 19, 1999); *Rosenberg v. Meriden Housing Auth.*, No. CV950377376, 1999 WL 1034611, at *9 n. 7 (Conn.Super.Ct. Oct. 29, 1999); *Dorlette v. Harborside Healthcare Corp.*, No. CV990266417, 1999 WL 639915, at *3 (Conn.Super.Ct. Aug. 9, 1999); *but see Olivas v. DeVivo Indus., Inc.*, No. CV990335908S, 2001 WL 282891 (Conn.Super.Ct. Feb. 28, 2001); *Smith v. City of Hartford*, No. XO7CV980070792S, 2000 WL 1058877, at *12 (Conn.Super.Ct. July 14, 2000); *Benson v. Northeast Utils.*, No. CV99058697, 2000 WL 151203, at *1 (Conn.Super.Ct. Jan. 20, 2000); *Martins v. Bridgeport Hosp.*, No. CV980350684S,

1999 WL 989451, at \*3 (Conn.Super.Ct. Oct. 6, 1999).

■ Absent further clarification from the Connecticut Supreme Court or the Second Circuit, we adhere to our earlier holdings that a state law claim for negligent infliction of emotional distress arising in the context of plaintiff's employment requires the plaintiff to plead unreasonable conduct in the termination process.[8]

Of course, plaintiff makes a rather weak argument that he was, in effect, terminated by virtue of being advised four years in advance of the end of his appointment that it would not be renewed. However, at the end of that four year period, at his urgent request, he was extended for another six months. Even should this be considered a termination of his employment, the actions of the defendant in that regard do not come close to constituting infliction of emotional distress.

We believe there are very good reasons for not expanding these causes of action to on-the-job incidents. As we held in *Malik v. Carrier Corp.*, 986 F.Supp. 86 (D.Conn. 1997) *aff'd in part, rev'd in part*, 202 F.3d 97 (2nd Cir.2000), "[w]e view this application of the doctrine of negligent infliction of emotional distress to employment relationships with some alarm. On the job, emotional distress is not an uncommon occurrence. (Indeed if we believe the comic strip *Dilbert*, it is an everyday occurrence)." *Id.* at 91.

### What constitutes extreme and outrageous conduct

Connecticut courts have relied on the Restatement (Second) of Torts for the meaning of "extreme and outrageous con-duct." *See Scandura v. Friendly Ice Cream Corp.*, No. 930529109S, 1996 WL 409337, at \*2–3 (Conn.Super.Ct. June 26, 1996); *Mellaly*, 42 Conn.Supp. at 19–20, 597 A.2d at 847; *Kintner v. Nidec–Torin Corp.*, 662 F.Supp. 112 (D.Conn.1987), *aff'd*, 814 F.2d 654 (2d Cir.1987); *DeLaurentis v. New Haven*, 220 Conn. 225, 266–67, 597 A.2d 807 (1991). The relevant section provides: "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) Torts § 46, cmt. d (1965). The Connecticut Supreme Court has instructed that "[l]iability for intentional infliction of emotional distress requires 'conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'" *DeLaurentis v. City of New Haven*, 220 Conn. 225, 266–67, 597 A.2d 807 (1991) (quoting *Petyan v. Ellis*, 200 Conn. 243, 254 n. 5, 510 A.2d 1337 (1986)).

Suits by doctors against hospitals alleging that the hospital did not live up to its obligations to them under contract, where the doctor has additionally asserted claims of infliction of emotional distress, are far from uncommon. Occasionally, these cases allege, as plaintiff has, that the hospital failed to assist the plaintiff's professional goals, thereby causing emotional distress. *See, e.g., Clarke v. Bridgeport Hosp.*, No. CV000270869S, 2001 WL 808405 (Conn.Super.Ct. June 15, 2001). Such claims are usually unsuccessful.

---

8. There are cases, of course, arising under various federal discrimination law statutes, in which an employee can recover for on-the-job infliction of emotional distress. For example, sexual harassment on-the-job is actionable. However, plaintiff alleges nothing arising under any of the federal employment discrimination statutes.

Here, the conduct alleged in plaintiff's complaint, even including the salary reductions and the failure to offer him a further appointment (to the extent that those matters can be considered in light of the failure to exhaust his remedies under the handbook), is far from extreme and outrageous. Assuming (but without holding) that allowing the formation of the "Group" was improper and a breach of contract, it certainly did not amount to extreme or outrageous conduct by Yale.

### Failure to plead with specificity

Furthermore, plaintiff's claims of emotional distress (both intentional and negligent)[9] should be dismissed for failure to plead the facts with at least sufficient particularity to form a basis for the allegations. While plaintiff admits certain formal omissions in his pleadings, he argues, primarily, that he need only plead the existence of emotional distress conclusorily and that it is for the jury at trial to determine whether or not the acts are sufficiently egregious to constitute the infliction of emotional distress. He is wrong in this argument. Whether the defendants' conduct as alleged is extreme and outrageous is a question for the Court. *Shaw v. Greenwich Anesthesiology Assocs., P.C.,* 137 F.Supp.2d 48, 69 (D.Conn. 2001); *Bell v. Bd. of Educ.,* 55 Conn.App. 400, 409–10, 739 A.2d 321. *See Johnson v. Chesebrough–Pond's USA Co.,* 918 F.Supp.

543, 552 (D.Conn.1996); *Mellaly v. Eastman Kodak Co.,* 42 Conn.Supp. 17, 18, 597 A.2d 846, 847 (Conn.Super.Ct.1991).

The plaintiff must do more than merely allege that what happened to him was extreme and outrageous or that he suffered emotional distress; rather, the plaintiff must allege specifically how the challenged actions were done in a manner that was so egregious or oppressive as to rise to the level of extreme and outrageous conduct. *See Dobrich v. General Dynamics Corp.,* 40 F.Supp.2d 90, 105 (1999); *Collins v. Gulf Oil Corp.,* 605 F.Supp. 1519 (D.Conn.1985). Without such a showing, the plaintiff cannot maintain an action for the intentional infliction of emotional distress.[10]

### Mental Distress requirement

Additionally, a claim for infliction of emotional distress requires that the defendant's conduct cause "mental distress of a very serious kind." *Muniz v. Kravis,* 757 A.2d 1207, 1211, 59 Conn.App. 704, 708 (2000). The plaintiff fails to allege in any convincing fashion that he suffered extreme emotional distress. Indeed, his claims primarily concern the financial burden that he claims the defendants placed upon him. He has not alleged any medical treatment for the emotional distress he claims he suffered.[11]

---

9. This line of reasoning applies to both claims since "the elements of negligent and intentional infliction of emotion distress differ as to the state of mind of the actor [but] not to the conduct claimed to be extreme and outrageous." *Muniz v. Kravis,* 757 A.2d 1207, 1212, 59 Conn.App. 704, 709 (2000).

10. The plaintiff seeks to further amend his complaint. (It has already been amended once.) As noted above, he has filed an overly long complaint and very lengthy motion papers. If page after page of allegations does

not demonstrate outrageous behavior, there is no reason to believe that allowing further details to be spelled out could strengthen the complaint.

11. Defendants states that the discovery responses reveal that the plaintiff did not seek any treatment. However, that is not an aspect to be considered on a motion to dismiss. Discovery has also indicated that plaintiff's current salary at his new position is more than twice what he earned at Yale.

In summary, while the complaint is long on hyperbole and emotion, it is very short on specific facts which could possibly support a claim of infliction of emotional distress. Consequently, both Counts Three and Four are dismissed.

### Conclusion

The Motion to Dismiss [**Doc. # 30**] is **GRANTED** in part (as to Counts Two, Three, and Four) and **DENIED** in part (as to Count One).

SO ORDERED.