Jennifer **COPELAND, Plaintiff,**

v.

**HOME AND COMMUNITY HEALTH SERVICES, INC., Defendant.**

**No. CIV.A.3–02–CV–2168 (JCH).**

United States District Court, D. Connecticut.

Sept. 29, 2003.

146

Gregg D. Adler, Deborah L. McKenna, Livingston, Adler, Pulda, Meiklejohn & Kelly, Hartford, CT, for Plaintiff.

Stephen B. Harris, Wiggin & Dana, New Haven, CT, Lori Rittman Clark, Wiggin & Dana, Hartford, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION TO DISMISS [DKT. NO. 4]

HALL, District Judge.

Plaintiff Jennifer Copeland brings this federal question action alleging that her former employer, Defendant Home and Community Health Services, Inc. ("the defendant" or "HCHS"), violated the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), as well as state tort law in the course of events leading up to her employment. The complaint alleges three separate counts: interference with FMLA, retaliation in violation of the FMLA, and negligent infliction of emotional distress. The defendant moves to dismiss only Count Three of the complaint, which alleges negligent infliction of emotional distress. The court denies the defendant's motion to dismiss.

## I. FACTS

In her complaint, the plaintiff alleges that, on or about November 29, 1999, she was hired to work as an intake nurse for HCHS. Compl. [Dkt. No. 1] ¶ 8. The plaintiff's supervisor, Sheileen Talbot, trained her and shared a small office with her. Their job functions required that they work with each other. *Id.* ¶¶ 10, 11. The relationship between the plaintiff and Talbot began to deteriorate, and Talbot's manner of conversing with the plaintiff became hostile and cold. *Id.* ¶ 12. At times, Talbot would slam down her phone when she received phone calls and fling files down in Copeland's desk in a harsh manner. During this tense period, which lasted until the plaintiff's termination, Talbot once said to the plaintiff: "We don't fire people here, we drive them out." *Id.* ¶ 12. The plaintiff became anxious and began to experience frequent headaches, "butterflies" in her stomach as she drove to work, and even a choking feeling at lunchtime, such that she could only eat soft foods. *Id.* ¶ 13.

On or about December 13, 2000, the plaintiff developed a severe headache and told Talbot that she was going to see the on-site occupational nurse. *Id.* ¶ 15. When the plaintiff returned to her desk, Talbot reprimanded her and slammed her chair very hard against the plaintiff's chair and said "tell me where you are if you are going to be gone for twenty minutes." *Id.* at 15. The plaintiff thereafter went to the head of the Human Resources Department, Terry Molnar, to speak to her about switching supervisors or offices. *Id.* ¶ 16. Because Molnar was not available to speak with the plaintiff at that time, the plaintiff informed instead Molnar's assistant, Erica, about her desire for a change from her current assignment. *Id.*

The next day, December 14, 2000, the plaintiff awoke with a severe headache and called in sick to work. The following day, December 15, 2000, she again felt ill and arranged for an appointment with a physician at Riverbend Medical Group ("Riverbend"). *Id.* ¶ 17. Dr. Corey Meyers saw the plaintiff on that day, diagnosed her with depression and components of obses-

sive compulsive disorder, and told her that she would require medication and immediate medical leave from work. *Id.* ¶ 18.

After Meyers' diagnoses, the plaintiff called Molnar and informed her about the situation. Molnar told the plaintiff that she would have to take FMLA leave because she was requesting more than five days off from work due to her health condition. *Id.* ¶ 19. During the same conversation, the plaintiff informed Molnar about the situation with Talbot. *Id.* ¶ 21. On December 29, 2000, the plaintiff returned to Riverbend for a follow-up visit with another physician, Dr. Alan Burstein, who diagnosed her with a panic disorder and a degree of obsessive compulsive disorder. On December 30, 2000, Dr. Burstein completed the Department of Labor's Certification of Health Care Provider form, noting that the plaintiff had a panic disorder and that the duration of her condition was indeterminate. *Id.* ¶ 23.

On or about January 2, 2001, the plaintiff tried to return for work but had a panic attack in the parking lot and instead left for her aunt's house. At her aunt's house, the plaintiff called Molnar to inform her that she would not be into work because of the panic attack. Molnar asked why she had not called her supervisor, Talbot, to report her absence due to illness. *Id.* ¶ 25. During this same conversation, Molnar informed the plaintiff that her request for a different supervisor or office was denied in part because Molnar and HCHS's Chief Financial Officer had concluded that the problem stemmed from a "personality" conflict between the plaintiff and Talbot. *Id.* ¶ 26. Molnar also informed the plaintiff that her position was "vital" to HCHS, pressuring her to return and mentioning that if she did not intend to return to work, they would have to hire someone else to replace her. *Id.* ¶ 27.

The plaintiff returned to Riverbend that afternoon and was examined by Nurse Practitioner Anna Fernandes. Fernandes gave the plaintiff a new medication for her anxiety and extended her medical leave until January 9, 2001. *Id.* ¶ 28. The plaintiff called Molnar and informed her of the results of her examination. Molnar asked that the plaintiff return to work prior to January 9, and Molnar agreed to call her on January 4, 2001 to inform her whether she would be able to do so. *Id.* ¶ 31. On January 4, 2001, the plaintiff telephoned Molnar to tell her that her symptoms had not subsided and that she would not be able to return before January 9. Molnar told the plaintiff that if she were unable to return to work on January 5, 2001, that they would have to fill her position. *Id.* ¶ 34. Molnar also asked if the plaintiff had another job lined up and asked for the plaintiff to send her a letter stating that she would not be returning. *Id.* ¶ 38. The plaintiff told Molnar that she did not have another job and that she would not send a letter because she did not intend to resign from her position. *Id.* ¶ 38. Molnar again warned the plaintiff again that if she did not return to work on January 5, 2001, HCHS would have to fill her position. The plaintiff understood Molnar to say that she had been terminated and asked that Molnar mail her her personal belongings. *Id.* ¶ 40. On January 5, 2001, Molnar wrote the plaintiff a letter stating that she hoped things were well, with the pictures and mementos that she had requested enclosed. *Id.*

## II. MOTION TO DISMISS STANDARD

■ The defendant moves to dismiss only Count Three of the plaintiff's complaint, alleging negligent infliction of emotional distress, for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss filed pursuant to Rule 12(b)(6) can be

granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). A Rule 12(b)(6) motion to dismiss cannot be granted simply because recovery appears remote or unlikely on the face of a complaint. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quotation omitted).

"While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). Rule 8 of the Federal Rules of Civil Procedure provides that a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2).

> The rule also requires that each averment of a pleading shall be simple, concise, and direct. Fed.R.Civ.P. 8(e)(1). Under the liberal pleading standards of the Federal Rules of Civil Procedure, a plaintiff must disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. Dismissal is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.

*Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000).

## III. DISCUSSION

First, citing *Muniz v. Kravis,* 59 Conn. App. 704, 709, 757 A.2d 1207 (2000), the defendant argues that Count Three of the plaintiff's complaint should be dismissed because she failed to allege that the defendant had engaged in "extreme and outrageous conduct," which it claims is necessary to state a cause of action for negligent infliction under Connecticut law. The plaintiff responds that extreme and outrageous conduct is an element of claims for intentional, but not negligent, infliction of emotional distress. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss Count Three of the Complaint, ("Pl.'s Mem. Opp.") [Dkt. No. 10], at 9–15. In the alternative, the defendants argue that the plaintiff has failed to allege facts sufficient to establish that the defendant acted unreasonably in the process of terminating her employment. *See* Reply Memorandum In Support of Motion to Dismiss Count Three of the Complaint, ("Reply Brief") [Dkt. No. 13] at 7.

Although the court concludes that plaintiffs need not have alleged extreme and outrageous conduct to state a claim for negligent infliction of emotional distress under Connecticut state law, it dismisses her claim nonetheless because it finds that the facts she alleges with respect to the process by which she was terminated cannot as a matter of law support a claim for negligent infliction of emotional distress.

The defendant argues that in order to establish a claim for negligent infliction of emotional distress, a plaintiff must plead facts that demonstrate that the defendant engaged in "extreme and outrageous conduct" that they should have realized would involve an unreasonable risk of causing emotional distress to the plaintiff, and that

such distress, might result in illness or bodily harm. Mem. In Supp. Mot. To Dismiss ("Def.'s Mem. Supp.") [Dkt. No. 4] at 4. In support of this proposition, the defendant relies primarily on a single sentence of dictum in a Connecticut Appellate Court opinion called *Muniz v. Kravis*, 59 Conn.App. 704, 757 A.2d 1207 (2000), where the court stated: "The elements of negligent and intentional infliction of emotional distress differ as to the state of mind of the actor and not to the conduct claimed to be extreme and outrageous." *Id.* at 709, 757 A.2d 1207.

 Leaving *Muniz* aside, Connecticut courts seem to agree on what a plaintiff has to allege to state a claim for negligent and intentional infliction of emotional distress. The Connecticut Supreme Court recognized a cause of action for negligent infliction of emotional distress where no physical injury ensues to the victim in *Montinieri v. S. New England Tel. Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). To prove a claim of negligent infliction of emotional distress, the plaintiff must establish that the defendant "knew or should have known that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily harm." *Buckman v. People Express, Inc.*, 205 Conn. 166, 173, 530 A.2d 596 (1987) (emphasis and internal quotation marks omitted). In contrast, with respect to claims for intentional infliction, a plaintiff must prove that:

(a) defendant[ ] intended to inflict emotional distress, or knew or should have known that emotional distress was a likely result of [its] conduct; (b) defendant['s] conduct was extreme and outra-

geous; (c) defendant['s] conduct caused the plaintiff's distress; and (d) the emotional distress suffered by the plaintiff was severe. The standard in Connecticut for conduct reaching the level of "extreme and outrageous" is defined as "that which exceeds all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."

*Mercer v. Brunt*, 272 F.Supp.2d 181, 188 (D.Conn.2002) (citations omitted). Neither party takes issue with these oft-cited principles.

However, in effect, the defendant argues that the phrase "conduct involv[ing] an unreasonable risk of causing emotional distress" associated with negligent infliction is synonymous with the "extreme and outrageous conduct" formulation used with respect to intentional infliction claims. *See* Def.'s Reply at 4. In fact, the defendant cites to a handful of lower court cases that seem to equate the terms "unreasonable" and "outrageous." These interpretations ignore the plain meaning of these phrases. "Unreasonable," according to *Black's Law Dictionary* (6th ed.1990), can mean "irrational; foolish; unwise; absurd; silly; preposterous; senseless; stupid ...; [n]ot reasonable; immoderate; exorbitant ...; [c]apricious; arbitrary; confiscatory." *Id.* 1538. By contrast, "outrageous"[1] is defined as "1. of the nature of or involving gross injury or wrong ... 2. grossly offensive to the sense of right or decency. 3. passing reasonable bounds; intolerable or shocking. 4. violent in action or temper. 5. highly unusual or unconventional; extravagant ...–Syn. 2. insulting, shocking, revolting. 3. unthinkable, appalling." *The*

---

1. Black's Dictionary does not define outrageous but only "outrage." Tellingly, in defining outrage, the dictionary notes that the standard for intentional infliction of emotional distress is outrageous and extreme conduct. The definition does not mention negligent infliction.

*Random House Dictionary: College Edition* 945 (1st ed.1968). Although neither epithet is desirable, the court notes that one would clearly rather have one's conduct called "unreasonable" than "outrageous." The way in which these terms are used in other legal contexts, e.g., unreasonableness in Fourth Amendment jurisprudence versus the outrageousness or "shocks the conscience" standard used with respect to substantive due process claims, *cf. Graham v. Connor,* 490 U.S. 386, 392–395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), supports an interpretation which views these terms as distinct.

The concurring opinion of Connecticut Supreme Court Justice Borden in *Carrol v. Allstate Insurance Co.,* 262 Conn. 433, 451–452, 815 A.2d 119 (2003), is instructive on this point. Addressing an issue tangentially related to, but not addressed in, the majority opinion, he states fairly unequivocally:

> In order to establish the tort of intentional infliction of emotional distress, the plaintiff must prove that the defendant's conduct was "extreme and outrageous." In order to establish the tort of negligent infliction of emotional distress, the plaintiff must prove that the defendant's conduct "involved an unreasonable risk of causing emotional distress ... that ... might result in illness or bodily harm." Thus, it seems apparent to me that, with respect to proof of the defendant's tortious conduct, the plaintiff has a more difficult burden when the defendant's state of mind is intentional, rather than negligent. Put another way, where the defendant's state of mind is purposefully to inflict emotional distress on the

plaintiff, the plaintiff may not recover unless the defendant's conduct in pursuance of that intent is also extreme and outrageous; but where the defendant did not have such a malevolent state of mind, but merely was negligent, the plaintiff may recover without having to prove that the conduct engaged in by the defendant was extreme and outrageous.

*Id.* Although Justice Borden goes on to discuss why the current state of the law is somewhat "anomalous," and even goes so far as to suggest the possibility for reform, he plainly represents the state of affairs he describes as the current state of the law. Thus, he concludes his discussion by saying: "I do not know how or why our law regarding these two torts has developed as it has. There may be a rational explanation. Perhaps some future case will present us with the opportunity to explore and resolve this apparent anomaly." *Id.* at 452, 815 A.2d 119.

█ It is against this legal backdrop that we return to examine the Connecticut Appellate Court's statement in *Muniz v. Kravis,* 59 Conn.App. 704, 757 A.2d 1207. The defendants and a number of lower courts have cited *Muniz* for the proposition that both intentional and negligent infliction claims require plaintiffs to plead "extreme and outrageous conduct." [2] Assuming this is the meaning the Appellate Court intended to convey, this court notes the relevant sentence in *Muniz* is pure *dicta.* The *Muniz* court was presented on appeal only with the question of whether the trial court had properly dismissed an intentional infliction claim for failure to

---

**2.** *See, e.g., Javier v. Engelhard Corp.,* No. 3:00–CV–2301 (JCH), —— F.Supp.2d ——, ——, 2001 WL 1268619, *2, 2001 U.S. Dist. LEXIS 17341, *16 (D.Conn. Oct. 1, 2001); *Franco v. Yale Univ.,* 161 F.Supp.2d 133, 142 n. 9 (GLG) (D.Conn.2001); *Shaw v. Shell Oil Prod-* ucts Co., 119 F.Supp.2d 62, 70 (D.Conn. 2000); *DeLaney v. Institute of Living,* No.' CV020097157S, 2002 WL 1559043, *2, 2002 Conn.Super. LEXIS 2069, *8 (Conn.Super.Ct. June 18, 2002).

allege that the defendant's conduct was extreme and outrageous; no issue concerning negligent infliction was before the court. More importantly, a number of decisions from the Connecticut Supreme Court which have dealt with infliction claims both before and after *Muniz* have not required extreme and outrageous behavior for negligent infliction.[3] Similarly, the bulk of lower court decisions have not required outrageous and extreme conduct with respect to claims for negligent infliction.[4] Thus, *Muniz* is simply not controlling.[5] For these reasons, the court concludes that the plaintiff does not need to allege outrageous and extreme conduct in order to state a cause of action for negligent infliction of emotional distress and thereby denies the motion to dismiss on this ground.[6]

3. *See, e.g., Perodeau v. City of Hartford,* 259 Conn. 729, 792 A.2d 752 (2002); *Parsons v. United Technologies Corp.,* 243 Conn. 66, 700 A.2d 655 (1997); *Buckman v. People Express, Inc.,* 205 Conn. 166, 173, 530 A.2d 596 (1987); *Morris v. Hartford Courant,* 200 Conn. 676, 513 A.2d 66 (1986); *Montinieri v. S. New England Tel. Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978); *cf. Carroll,* 262 Conn. at 442–448, 449 n. 13, 815 A.2d 119.

4. *See, e.g., DeCorso v. Watchtower Bible & Tract Soc'y of N.Y., Inc.,* 78 Conn.App. 865, 874–880, 829 A.2d 38 (first approving the dismissal of intentional infliction claim for failure to show outrageous and extreme conduct and later upholding dismissal of negligent infliction claim on entirely different grounds); *Edwards v. Community Enterprises, Inc.,* 251 F.Supp.2d 1089, 1106 (D.Conn. 2003) (granting motion to dismiss intentional infliction claim for failure to show outrageous and extreme conduct but refusing to dismiss negligent infliction claim); *Armstead v. Stop & Shop Cos.,* No. 3:01cv1489 (JBA), 2003 WL 1343245, *4, 2003 U.S. Dist. LEXIS 4107, *17–19 (D.Conn. March 17, 2003) (discussing distinct conduct requirements for intentional and negligent infliction claims).

5. The plaintiff also suggests that the defendant is simply misreading *Muniz.* According to this line of argumentation, if the court in *Muniz* had really intended to announce such a groundbreaking reshaping of state tort law, it did so with surprisingly little comment or fanfare. A closer reading of the *Muniz* decision suggests that in alluding to *Parsons,* a case which involved conduct by the defendant that was "virtually identical" to that before the court and in which the allegations were found to have been insufficient to support a claim for negligent infliction, the court seems merely to have intended to highlight its central point that if the behavior was not egregious enough to satisfy the *Parsons* court in an intentional infliction case, it clearly could not have sufficed in the case before the court involving negligent infliction.

6. The court recognizes that some courts may be applying a heightened pleading standard with respect to the conduct element in negligent infliction cases involving termination of employment in light of the Connecticut Supreme Court's decision in *Perodeau,* 259 Conn. 729, 792 A.2d 752. *See, e.g., Schug v. Pyne–Davidson Co.,* No. 3:99CV1493(CFD), 2001 U.S. Dist. LEXIS 21246, *24 (D.Conn. Dec. 10, 2001) ("In order to sustain a claim of negligent infliction of emotional distress in this setting, Schug must allege that his 'actual discharge was done in an inconsiderate, humiliating or embarrassing manner.' "); *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 197 (D.Conn.2000) (identifying different conduct requirements for intentional and negligent infliction claims but stating that "in the context of negligent infliction of emotional distress, to be unreasonable, the employer's conduct must be humiliating, extreme, or outrageous"). As one district court noted,

> Because emotional distress in the workplace is not uncommon, courts have "viewed the application of the [negligent infliction of emotional distress] doctrine to employment relationships with some alarm." Moreover, the Connecticut Supreme court has stated that, in the employment context, "courts should not lightly intervene to impair the exercise of management discretion or to foment unwarranted litigation." Therefore, courts have been concerned about the expansion of this claim in the employment context and have kept a "tight rein" on these claims.

In the alternative, the defendant moves to dismiss on the grounds that the plaintiff has not plead facts which show that the defendant engaged in unreasonable conduct during the termination process. Finding that the factual allegations in support of this count, when viewed in the light most favorable to the plaintiff, suffice to meet the requirements set forth in *Perodeau*, the court denies the defendant's motion to dismiss on Count Three.

▮▮▮▮ The defendant is correct that, in the employment context, liability for negligent infliction of emotional distress can arise only for conduct in the "termination process," not for behavior that is "part of an ongoing employment relationship." *See Perodeau*, 792 A.2d at 762; *see Parsons*, 243 Conn. at 88, 700 A.2d 655 ("Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process."); *Absher v. Flexi Int'l Software, Inc.*, No. 3:02CV171, 2003 WL 2002778, *3, 2003 U.S. Dist. LEXIS 6089, *9 (D.Conn. March 31, 2003) (dismissing negligent infliction claim due to plaintiff's failure to "allege any conduct pertaining to the termination of her employment"); *cf. Brunson v. Bayer Corp.*, 237 F.Supp.2d 192, 208 & n. 19 (D.Conn.2002) (applying *Perodeau* to

dismiss negligent infliction claim against corporate defendant).[7] According to the Connecticut Supreme Court, "the mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior, and therefore is not enough, by itself, to sustain a claim for negligent termination of employment." *Parsons*, 243 Conn. at 88–89, 700 A.2d 655 (internal quotation marks and citation omitted). Thus,

[i]n order to sustain a claim of negligent infliction of emotional distress in this setting, [the plaintiff] must allege that his "actual discharge was done in an inconsiderate, humiliating or embarrassing manner." A plaintiff cannot base such a claim on the fact of termination alone, even if that termination was wrongful. Thus, in evaluating the plaintiff's claims, the Court first must determine whether he has presented evidence (1) that his employer engaged in unreasonable conduct, that is, conduct which was "inconsiderate" or intended to humiliate or embarrass the employee and, (2) that the conduct was engaged in during the course of the employment termination process.

*Schug v. Pyne–Davidson Co.*, No. 3:99CV1493(CFD), 2001 U.S. Dist. LEXIS

---

*Miner*, 126 F.Supp.2d at 197.

**7.** With somewhat more hesitation, the District Court for the District of Connecticut in *Schug*, 2001 U.S. Dist. LEXIS 21246, reached the same conclusion:

However, the Second Circuit, in dictum, has stated that it is unclear whether the Connecticut Supreme Court would continue to limit the tort of negligent infliction of emotional distress to actions taken in the course of an employee's termination. *Malik v. Carrier Corp.*, 202 F.3d 97, 103–04 n. 1 (2d Cir.2000); *see also Karanda v. Pratt & Whitney Aircraft*, 1999 Conn.Super. LEXIS 1244, No. CV–98–582025S, 1999 WL 329703, at *5 (Conn.Super.Ct. May 10, 1999), criticized by *Dorlette v. Harborside*

*Healthcare Corp.*, 1999 Conn.Super. LEXIS 2165, No. CV 990266417, 1999 WL 639915, at *3 (Conn.Super.Ct. Aug.9, 1999).

Nevertheless, it appears that most Connecticut courts continue to adhere to the ruling limiting negligent infliction of emotional distress claims to conduct arising in the termination process, and the Connecticut Supreme Court has not changed the approach of Parsons. *See Franco v. Yale University*, 161 F.Supp.2d 133, 140 (D.Conn. 2001) (citing cases). Thus, this Court will follow the Parsons standard. However, the plaintiff appears to also argue that the termination itself was an action that caused emotional harm to the plaintiff.

*Id.*, at *23–24.

21246, at \*24–25 (internal citations omitted).

Reviewing the complaint in the light most favorable to the plaintiff, the court concludes that the plaintiff has alleged behavior by the defendant, occurring in the process of her termination, that could be found to have been unreasonable and thus that could support a claim for negligent infliction of emotional distress. The plaintiff repeatedly advised Molnar about both the existence of and the nature of her health problems. Yet, Molnar, despite her alleged awareness of the plaintiff's susceptibility, during a period spanning almost a month, from December 15, 2000 until January 5, 2001, pressured the plaintiff to return to work by being inflexible about the date on which she was required to return to work and by threatening to hire, and ultimately hiring, a replacement when the plaintiff did not return on this date. Because the court concludes that the plaintiff has alleged sufficient facts to survive a motion to dismiss, it denies the defendant's motion to dismiss Count Three of her complaint alleging negligent infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [Dkt. No. 4] is DENIED. Count Three of the plaintiff's complaint alleging negligent infliction of emotional distress survives.

**SO ORDERED.**