**Thelma EDWARDS, Plaintiff,**

v.

**COMMUNITY ENTERPRISES, INC., Defendant.**

No. 3:00CV1518 (SRU).

United States District Court, D. Connecticut.

March 17, 2003.

Peter D. Goselin, BetzaBeth Sanchez, Livingston, Adler, Pulda, Meiklejohn & Kelly, Hartford, CT, for plaintiff.

Gregory B. Nokes, Cummings & Lockwood, Hartford, CT, for defendant.

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

This case arises from the termination of Plaintiff Thelma Edwards from her position with Defendant Community Enterprises, Inc. ("Community Enterprises"). Edwards filed suit against Community Enterprises, alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.;* intentional infliction of emotional distress; negligent infliction of emotional distress; defamation; and violations of state and federal minimum wage and overtime laws codified in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 210, *et seq.,* and Connecticut General Statutes § 31–58, *et seq.* On December 28, 2001, Edwards filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the issues of whether she constituted an "employee" for purposes of the FLSA, FMLA, and Connecticut General Statutes, and whether Community Enterprises constitutes an "enterprise" under the FLSA. On December 31, 2001, Community Enterprises filed a cross-motion for summary judgment on all five of Edwards' claims, arguing that, as a matter of law, it is not an enterprise within the meaning of the FLSA; Edwards is not an employee within the meaning of the FLSA, FMLA, or Connecticut General Statutes, and Ed-

wards has not demonstrated facts sufficient to support her claims for intentional or negligent infliction of emotional distress or defamation. For the following reasons, Edwards' motion for summary judgment (Dkt. No. 27) and Community Enterprises' cross-motion for summary judgment (Dkt. No. 30) are both granted in part and denied in part.

## FACTS

Community Enterprises was incorporated in 1975 as a non-profit corporation. Its mission "is to support self-determination for individuals with disabilities and/or other challenges to actively live, learn, and work in the community." (http://www.communityenterprises.com, Ex. 1 at 2 of 9(c)(1) Statement in Supp. of Pl.'s Opp'n. to Def.'s Mot. for Summ. J.) Community Enterprises serves approximately 1,500 individuals with disabilities each year, and has an annual budget of $12,000,000. *Id.* at 3. It has over 100 cost centers and funding sources, *id.* at 3, and primarily offers supported employment and supported living services (Cauley Dep. at 17).

The supported living program constitutes a substantial portion of Community Enterprises' services. Community Enterprises has a contract with Connecticut Department of Mental Retardation ("DMR") to provide supported living services. (Cauley Dep. at 25.) The approximate value of that contract during fiscal year 2000 was $900,000. *Id.* at 25–26. The contract is renewed annually. *Id.* at 25.

Under the supported living program, social workers assess each client's needs, plan for his or her transition into the community, advocate on the client's behalf, monitor health and safety, and provide counseling, among other services. (http://vgernet.net/ceinc, Ex. 2 at 2 of 9(c)(1) Statement in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J.) Depending on the level of funding provided by the DMR for each client, Community Enterprises

may arrange for a "companion" to support the client, or a housemate to live with the client in a "homeshare" arrangement. *Id.* ("The support of companion/volunteers is another major component of the service that is arranged through this program. The participant may also live in a 'homeshare' or 'housemate' arrangement made by the program."). Parties and witnesses have used many terms to refer to persons providing housemate or companion services on behalf of Community Enterprises' homeshare program. The court shall refer to such persons as "homeshare providers" in this ruling.

Community Enterprises obtains clients for its supported living program in two ways. Clients can be referred by agencies such as the DMR that have contracted with Community Enterprises. (http://www.communityenterprises.com, Ex. 1 at 3, of 9(c)(1) Statement in Supp. of Pl.'s Mot. for Summ. J.) Community Enterprises will also take clients who have not been referred when the clients are willing to pay. (http://vgernet.net/ceinc, Ex. 2 at 1 of 9(c)(1) Statement in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J. ("All of the services listed below may also be available to individuals who are interested in a private pay arrangement."))

In 1996, the DMR referred a mentally retarded woman, referred to in this ruling by her initials "BJP," to Community Enterprises to participate in the supported living program. BJP required constant supervision and assistance with basic life activities due to her physical and mental limitations. (Daley Dep. at 43; Suiter Dep. at 35–36, 116–17; Edwards Dep. at 18.) Because of the high level of assistance and monitoring BJP required, Community Enterprises determined that a homeshare arrangement was most appropriate for BJP. Angela Daley, the director of the supported living program at that

time, discussed with BJP's parents what type of individual they believed would be best suited to live with BJP. (Daley Dep. at 20–21.) Daley and Sue Cauley, Community Enterprise's Vice President of Connecticut Operations, then discussed the position with Edwards. (Edwards Dep. at 17.) Edwards had several additional meetings, including meetings with Daley, BJP, and BJP's parents; and Margaret Stowell, BJP's DMR caseworker. (Edwards Dep. at 20.)

After Edwards spent a trial weekend with BJP, Daley and BJP's parents concluded that the Plaintiff was an appropriate match. (Daley Dep. at 25; Edwards Dep. at 30.) Although BJP's parents had a significant say in approving Edwards and selecting the particular apartment in which BJP's homeshare services would be provided (Daley Dep. at 23, 26–27; Edwards Dep. at 30), Community Enterprises recruited Edwards (Daley Dep. at 23), approved the selection of both Edwards and the apartment after BJP's parents had done so (Daley Dep. at 24 ("And then after that, as an agency, the next step once they said that they liked her, before she could, you know, be with that client we just had to make sure we did our part, like criminal background checks."), 27), and was ultimately responsible for coordinating and arranging the home share (http://vger-net.net/ceinc, Ex. 2 at 2 of 9(c)(1) Statement in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J. ("The participant may also live in a 'homeshare' or 'housemate' arrangement made by the program."))

Edwards lived with BJP as a live-in homeshare provider from September 1, 1996 to January 28, 2000. (Daley Dep. at 31; Edwards Dep. at 39.) In support of her motion for summary judgment, Edwards submitted two contracts defining her relationship with Community Enterprises. The first contract, entitled "Neighbor/Participant Contract," was signed August 29, 1996. (Neighbor/Participant Contact at 3 (hereinafter the "1996 Agreement").) In addition to defining Edwards' general responsibilities, conditions warranting termination, and ordinary procedures for termination, the 1996 Agreement also provides for emergency termination. Under the contract, in the case of an "emergency, or when [a] determination has been made that the Participant's mental or physical well-being is endangered, the termination may be immediate." *Id.* at 2.

Edwards and Suiter discussed the terms of Edwards' relationship with Community Enterprises on several other occasions, including once over the phone in May 1999. (Suiter Dep. at 199.) Suiter reduced the agreement they reached in May 1999 to writing, signed it on November 16, 1999, and sent it to Edwards for her signature. (Agreement Between Thelma Edwards Live in Roommate and Debra A. Suiter Director Supported Living (hereinafter the "1999 Agreement"); Suiter Dep. at 199.) Edwards did not sign the 1999 Agreement. (Suiter Dep. at 199–200.) However, Suiter agrees that the 1999 Agreement, for the most part, accurately reflected the arrangement between Community Enterprises and Edwards at the time Suiter signed it. (Suiter Dep. at 201–03.) The dates of the agreement were from July 1, 1999 to June 30, 2000.

Under the terms of the agreement, Edwards received a monthly stipend of $2350. DMR fixed the amount of the stipend paid to Edwards. (Cauley Dep. at 66.) The amount of each homeshare provider's stipend varied based on the amount of care required by the client. (Cauley Dep. at 66–67; Daley Dep. at 18–19.) Once, while Edwards worked for Community Enterprises, Suiter sought and obtained a raise in Edwards' stipend due to the demanding nature of her work with BJP. (Suiter Dep.

at 99–102.) Community Enterprises did not withhold taxes from Edwards' pay, and did not provide her with benefits. Edwards was required to pay half of the utilities and rent for the apartment she shared with BJP. (Edwards Dep. at 57–58.) BJP paid the other half of the utilities and rent out of social security, disability insurance, and other benefits. (Daley Dep. at 27; Calvert Dep. at 21; Edwards Dep. at 58–59.)

The 1999 Agreement required Edwards to receive CPR training. Her responsibilities included assisting BJP with: "domestic tasks, laundry, grocery shopping, cooking, budgeting, personal hygiene, verbal reminders to take medications, medical/dental appointments, recreation/leisure activities." (1999 Agreement at 1.)

The 1999 Agreement precisely defined Edwards' work hours and permitted leave. Each week, Edwards had off from 8:30 a.m. to 6:30 p.m. on Monday, Wednesday, and Friday. *Id.* On Tuesday, Thursday, Saturday, and Sunday, U.S. Home Care provided four hours of support to Edwards. *Id.* Each month, Edwards received one weekend off, "starting when [BJP] leaves for work on Friday at 8:30 a.m. until Sunday at [3:00 p.m.]." *Id.* Additionally, Edwards received "two weeks off per year (14 days)." *Id.* She was required to give at least a month's notice prior to using the two weeks of vacation so that Community Enterprises could arrange alternative coverage. *Id.* Outside of this fixed time off and two weeks' leave, Edwards was required to be with BJP at all other times. (Daley Dep. at 43 (stating that except for those times when there was some other specific arrangement made for [BJP], [Edwards] had to be there twenty-four hours a day, seven days a week).)

By the end of 1999, Edwards' relationship with BJP had become strained. Edwards often complained about living and working with BJP. (Suiter Dep. at 84, 110–11, 146.) At some point well before her termination, Edwards moved many of her belongings out of her bedroom. (Suiter Dep. at 111–13.) Edwards did this because Community Enterprises allowed care providers to use her bedroom when she had a weekend off. *Id.* at 113. The fact that Edwards did this made Suiter fearful that she would quit at any moment. *Id.* at 112.

Around November or December of 1999, Suiter became concerned that Edwards should no longer work with BJP as a homeshare provider. (Suiter Dep. at 121.) Suiter was concerned, at least in part, because BJP required a higher degree of assistance than was appropriate or possible in a homeshare arrangement. She began raising these concerns at treatment team meetings, meetings that Edwards was no longer invited to attend. (Suiter Dep. at 121–23.) Notes from a December 20, 1999 meeting reflect that the treatment team was already considering replacing Edwards at that time. (Ex. C to Mem. in Supp. of Def.'s Mot. for Summ. J.)

The rift between Edwards and Community Enterprises reached its head when Edwards requested time off on December 31, 1999. It is unclear how far in advance Edwards requested this time off, though Lori Calvert, Edwards' lead support coordinator, alleges Edwards made the request just a few days in advance. (Calvert Dep. at 72; Suiter Dep. at 155–56.) Community Enterprises denied that request because it could not arrange for alternative supervision for BJP. Edwards then took BJP to her daughter's home in Springfield, Massachusetts. (Calvert Dep. at 52.) She cashed BJP's rent subsidy check and used a portion of the funds to pay someone to watch her on the evening of December 31, 1999. (Calvert Dep. at 52; Edwards Dep. at 102.) She later provided Calvert with a receipt (Ex. D to Mem. in Supp. of Def.'s

Mot. for Summ. J.), and the check stub. (Calvert Dep. at 52.)

Suiter was not sure if Community Enterprises had any written rules prohibiting the use of a client's money to pay for someone to watch the client, or if Edwards was aware that such conduct would violate Community Enterprises' policies. (Suiter Dep. at 164–65.) However, Suiter believed that Edwards' actions constituted theft, and thought this was a sufficient reason to terminate Edwards from the program. *Id.* at 165 ("Because in my eyes, that's stealing."), 177–78. Suiter alleges that, within a week of her receiving notification of Edwards' use of BJP's money, the treatment team decided to terminate Edwards. *Id.* at 176–77.

On January 12, 2000, Patrice Belinsky, a Community Enterprises support coordinator, took Edwards to the emergency room where she was diagnosed with pneumonia. (Calvert Dep. at 46–47; Edwards Dep. at 92.) Community Enterprises concedes that it encouraged Edwards to seek treatment. (Def.'s Mem. in Supp. of Def. Mot. for Summ. J. at 12 ("In fact, it was Defendant that first encouraged her to seek treatment.") (citing Cauley 105).) Following her doctor's recommendation, Edwards did not return to work until January 26, 2000. On Friday, January 28, 2000, Suiter called Edwards at her daughter's home in Springfield, Massachusetts, notifying her that she was being replaced because she had taken money from BJP's account to pay for a baby-sitter on New Years Eve, and demanding that she remove all her belonging from the apartment by Sunday. (Suiter Dep. at 140–41.) Suiter threatened that if Edwards was not out by Sunday, she would have the police remove her. (Suiter Dep. at 142.)

Suiter later discussed Edwards' termination with BJP's father. Suiter does not recall whether she used the term "steal" to describe Edwards' conduct in cashing BJP's rent check to pay for someone to watch her on New Year's Eve. (Suiter Dep. at 170.) Suiter admits that she may have used the word "steal," and "was very clear that she had taken [BJP's] money to pay for a baby-sitter ...." *Id.* at 170. Similarly, Calvert, who overheard the conversation, could not recall whether Suiter described Edwards' conduct as "stealing." (Calvert Dep. at 59–60.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law, under the applicable substantive law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998). Thus, if reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate. *See R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997).

When ruling on a summary judgment motion, the court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting

*United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quoting *Diebold,* 369 U.S. at 655, 82 S.Ct. 993); *see also Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). When ruling on cross motions for summary judgment, the court must construe the facts against the moving party when deciding each motion. The court may not weigh the evidence, even when the court believes such evidence is implausible. *See Anderson,* 447 U.S. at 249, 100 S.Ct. 2124; *R.B. Ventures,* 112 F.3d at 58–59. Ultimately, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. . . ." *Anderson,* 447 U.S. at 255, 100 S.Ct. 2124.

The moving party bears the initial burden of showing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Langman Fabrics v. Graff Californiawear,* 160 F.3d 106, 110 (2d Cir.1998). However, the movant need not prove an absence of a genuine issue of material fact where the nonmoving party bears the burden of proof. In such circumstances, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

If the movant has met the initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). The nonmoving party may not rest upon the mere allegations or denials of the pleadings, but rather must present sufficient probative evidence from which a rational trier of fact could find for the nonmovant. *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548; *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

If the nonmovant fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, summary judgment is appropriate. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In such a situation, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548 (internal quotation marks and citation omitted).

## DISCUSSION

*The Fair Labor Standards Act Claims*

Edwards alleges in count one of her complaint that Community Enterprises violated federal minimum wage and overtime laws, codified in the FLSA, 29 U.S.C. § 201, *et seq.* Section 206(a) of Title 29 provides that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce," a minimum hourly wage. Section 207(a) provides that "[e]xcept as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in any enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above

specified at a rate not less than one and one-half times the regular rate at which he is employed." For Community Enterprises' relationship with Edwards to be subject to the minimum wage and maximum hour requirements of the FLSA, three conditions must be satisfied: (1) Community Enterprises must constitute an "enterprise engaged in commerce or in the production of goods for commerce"; (2) Edwards must constitute an employee within the meaning of the Act; and (3) the relationship must not fall within one of the exceptions to the Act. *See* 29 U.S.C. §§ 206(a), 207(a); *Tony & Susan Alamo Foundation, et al. v. Secretary of Labor,* 471 U.S. 290, 295, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (hereinafter *"Alamo Foundation "*).

Edwards' motion for summary judgment asks the court to hold as a matter of law that: (1) she was an "employee," and (2) Community Enterprises constitutes an "enterprise" for purposes of the FLSA.[1] Community Enterprises argues in its cross motion for summary judgment that Edwards' claim under the FLSA fails as a matter of law because, under the FLSA, (1) Edwards was not an "employee," (2) Community Enterprises was not an "enterprise," and (3) Edwards fell within the exemption for companionship services. For the following reasons, on these issues Edwards' motion for summary judgment is granted, and Community Enterprises' motion for summary judgment is denied.

1. Whether Edwards constitutes an "employee" under the FLSA

▮ The minimum wage and maximum hour requirements of the FLSA apply only to "employees." 29 U.S.C. §§ 206(a), 207(a). Under the FLSA, "the term 'employee' means any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" means "to suffer or permit to work," 29 U.S.C. § 203(g). The definition of "employee" is "exceedingly broad." *Alamo Foundation,* 471 U.S. at 295, 299 n. 21, 105 S.Ct. 1953.

[2] Courts have used the "economic realities" test to determine whether an individual is an employee under the FLSA. *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Alamo Foundation,* 471 U.S. at 301, 105 S.Ct. 1953. The economic realities test is a totality of the circumstances test that considers: (1) the degree of the employer's control over the worker; (2) the worker's opportunity for profit or loss and his investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *McGuiggan v. CPC International, Inc.,* 84 F.Supp.2d 470, 479 (S.D.N.Y.2000); *see also Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988) ("The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."). "The existence and degree of each factor is a question of fact, while the legal conclusion to be drawn from these facts—whether workers are employees or independent

---

**1.** Although Edwards did not expressly request summary judgment in her motion or memorandum in support of the motion on the issue of whether Community Enterprises constitutes an "enterprise," Community Enterprises admits that such request was implicit in Edwards' Memorandum in Support of the Motion. (Mem. in Supp. of Opp. to Pl.'s Mot. for Summ. J. at 16 n. 3 ("Although Plaintiff did not explicitly seek summary judgment on this issue, raising it is her memorandum in support of summary judgment permits a response from Defendant.")) Both Community Enterprises and Edwards briefed the issue, respectively, in the Memorandum in Support of Defendant's Opposition and the Plaintiff's Reply.

contractors—is a question of law." *Brock,* 840 F.2d at 1059.

### a. Degree of control over Edwards

The evidence overwhelmingly supports the conclusion that Community Enterprises exercised a high degree of control over Edwards. Community Enterprises was required to approve Edwards' hiring and termination. (1996 Agreement.) The 1996 and 1999 Agreements defined the particular domestic tasks Edwards was obligated to perform, such as laundry, grocery shopping, cooking, budgeting, and cleaning. She was obligated to have particular training and submit monthly budget information, rent subsidy forms, and entitlement paperwork as requested by the director. (1999 Agreement.) Community Enterprises also exercised strict control over Edwards' schedule and hours. The agreement provided that Edwards would have off from 8:30 a.m. to 6:30 p.m. on Monday, Wednesday, and Friday; that she would have support for four hours a day on Sunday, Tuesday, Thursday, and Saturday; and that she would have off one weekend per month. *Id.* Although Edwards was permitted 14 days off per year, she was obligated to give a month's notice so that Community Enterprises could find a replacement. *Id.* In light of Community Enterprises' control over the existence of an employment relationship, the strict hours, and well defined responsibilities, it is apparent that Edwards had little control over her work, and this factor weighs heavily in the Plaintiff's favor.

### b. The worker's opportunity for profit or loss and her investment in the business.

Edwards received a fixed monthly stipend for her work. Although Community Enterprises and DMR once increased her stipend in recognition of the difficulty of caring for BJP, the stipend was in no way tied to the performance of the corporation. Because Edwards did not have any opportunity for profit or risk of loss based on increased or decreased business, this factor weighs in Edwards' favor.

### c. The degree of skill and independent initiative required to perform the work.

Although the DMR provided Edwards with a week of training on caring for the mentally retarded (Edwards Dep. at 25–26), and Community Enterprises trained Edwards in CPR (*id.* at 57), the job required little skill or independent initiative. In selecting candidates, Community Enterprises was most concerned about matching the candidate with the client and the absence of a criminal record. (Cauley Dep. at 47.) Although Cauley noted that Community Enterprises provided additional training and support if a candidate lacked experience, Community Enterprises did not have any education, experience, licensing, or certification requirements. *Id.* at 47–48. Cauley stated that "It's really around the match for the person.... It's really kind of their interactions with the individual." *Id.* at 47. According to Daley, Edwards had no prior training in human services. (Daley Dep. at 25.) Most of the tasks required of homeshare providers are routine life skills such as cooking, cleaning, and balancing a checkbook. (1999 Agreement at 1.) The nature of the job, as demonstrated by the required tasks, left little room for independent initiative. Because the job required little skill or independent initiative, and because Community Enterprises did not require any particular experience or education, this factor weighs heavily in favor of the plaintiff.

### d. The permanence or duration of the working relationship.

Community Enterprises hired Edwards on August 29, 1996, and terminated her on

January 28, 2000. Other than the total length of time Community Enterprises had employed her, Edwards cannot point to any evidence that the parties expected the relationship to be permanent. At the time Community Enterprises terminated Edwards, she was working under a one year agreement. (1999 Agreement.) Although one year is a fairly substantial length of time, the fact that her contract was year to year suggests that the parties did not anticipate an indefinite relationship, or at least that Community Enterprises sought some flexibility in its relationships with home care providers. The term of relationship more closely resembles that of an independent contractor than that of an employee. Accordingly, this factor weighs in favor of Community Enterprises.

e. The extent to which the work is an essential part of the employer's business.

The parties submitted little evidence concerning this factor, and Community Enterprises does not take a position on the issue. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 19.) The little evidence the parties submitted shows that homeshare providers are an essential part of Community Enterprises' supported living program, and that the supported living program, constitutes a substantial portion of the services provided by Community Enterprises. BJP required constant supervision. To provide that supervision for BJP and other persons in the program, Community Enterprises hired Edwards and other homeshare providers. (http://vgernet.net/ceinc, Ex. 2 at 2 of 9(c)(1) Statement in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J.) ("The support of companion/volunteers is another major component of the service that is arranged through this program. The participant may also live in a 'homeshare' or 'housemate' arrangement made by the program."). Because the scant evidence submitted on this point demonstrates that homeshare providers are an essential part of Community Enterprises' business, this factor weighs in favor of Edwards.

The court holds that, considering the totality of the circumstances under the economic realities test, Edwards constituted an employee for purposes of the FLSA. Although Edwards was working under a one-year contract when she was terminated, all the other characteristics of her relationship with Community Enterprises support a finding that she was an employee. Community Enterprises recruited and hired her, set her hours, approved her vacation, monitored her work, dictated her training, set her responsibilities, and ultimately decided to terminate her. The work itself required no particular skill or initiative, but the work was critical to the mission of Community Enterprises. Edwards was paid a fixed monthly stipend, and in no way was her pay tied to the performance of the corporation. For all of these reasons, a reasonable jury could not find that Edwards was not an employee of Community Enterprises. The court holds that Edwards constituted an employee of Community Enterprises as a matter of law for purposes of the FLSA.

2. Whether Community Enterprises constitutes an enterprise

■ The minimum wage and maximum hour requirements of the FLSA apply only to employees who are "engaged in commerce or in the production of goods for commerce," or who are "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a); *see also Boekemeier v. Fourth Universalist Society,* 86 F.Supp.2d 280, 285 (S.D.N.Y.2000). Because the Act defines commerce as "trade, commerce, transportation, transmission, or communication among the several States

or between any State and any place outside thereof," 29 U.S.C. § 203(b), and because Edwards does not claim that she was directly involved in interstate commerce, Edwards must prove that Community Enterprises is an enterprise engaged in commerce or in the production of goods for commerce.

An "enterprise engaged in commerce or in the production of goods for commerce," means an enterprise that (1) "has employees engaged in commerce or in the production of goods for commerce" and whose annual gross sales are not less than $500,000, 29 U.S.C. § 203(s)(1)(A); (2) "has employees ... working on goods or materials that have been moved in or produced for commerce by any person" and whose annual gross sales are not less than $500,000, *id.*; or (3) "is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution ...", *id.* at § 203(s)(1)(B).

Community Enterprises clearly meets the first definition of an enterprise engaged in commerce. Edwards submitted uncontroverted evidence that Community Enterprises owns and operates a temporary employment agency named "DBA" or Dependable Business Alternatives. (http://www.communityenterprises.com, Ex. 1 at 1 of 9(c)(1) Statement in Opp'n. to Def.'s Mot. for Summ. J.). According to Community Enterprises' website, all profits from this subsidiary "go to our parent company, Community Enterprises, Inc." *Id.* In Fiscal Year 1995, DBA produced over $2.75 million in revenue. (Community Enterprises, Inc. and Subsidiaries Consolidated Statement of Activities for the Year Ended June 30, 1995, Ex. 15 at 188 of Reply in Supp. of Pl.'s Mot. for Summ. J.)

DBA is a part of the relevant enterprise because it provides related activities, is under the common control of Community Enterprises, and has a common business purpose. *See* 29 U.S.C. § 203(r)(1) ("'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units ...."); *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973). DBA's provision of temporary employment services complements Community Enterprises vocational training programs; Community Enterprises even advertises for DBA on its website. The website attempts to attract business for its subsidiary by emphasizing that Community Enterprises receives all profits generated by the employment agency, thus establishing the common business purpose. For these reasons, the court holds that Community Enterprises constitutes an "enterprise engaged in commerce or in the production of goods for commerce" as a matter of law. Edwards' motion for summary judgment on this issue is granted, and Community Enterprises' motion is denied.

3. Whether Edwards' position falls within the companionship services exemption to the minimum wage and overtime laws

■ Community Enterprises moves for summary judgment on the issue of whether Edwards' position with Community Enterprises fell within the companionship services exemption to the FLSA. Section 213(a)(15) of Title 29 provides that the minimum wage and maximum hour provisions shall not apply to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such

terms are defined and delimited by regulations of the Secretary)."

The Department of Labor defines domestic services as "services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed." 29 C.F.R. § 552.3 To illustrate its definition, the Department of Labor provided non-exhaustive list of employees engaged in domestic services, including "cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs." *Id.*

The Department of Labor defines companionship services as "those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs." 29 C.F.R. § 552.6. Examples of "[s]uch services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services." *Id.*

Edwards clearly provided companionship services to an infirm individual who was unable to care for herself. Edwards cared for, protected, and provided companionship to BJP. The evidence that BJP could not function independently because of her physical and mental disabilities is uncontroverted.

However, the issue of whether the apartment shared by Edwards and BJP was a private residence, and therefore whether Edwards was employed in domestic service, is a genuine issue of material fact. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Community Enterprises approved the selection of the apartment and removed Edwards from the apartment when it terminated her, even though she paid

rent. Community Enterprises had other care providers stay in the apartment when Edwards had a weekend off. (Suiter Dep. at 114.) Suiter also had her husband install a lock on Edwards door when Edwards complained about other care providers using her bedroom. (Suiter Dep. at 111.) However, Edwards and BJP paid the rent from their own funds and were responsible for maintaining the apartment. Edwards and BJP's parents also decided, without consulting Community Enterprises, to switch apartments within their apartment complex when a noisy neighbor was preventing BJP from sleeping. (Edwards Dep. at 61–62.) Accordingly, the court finds that a jury could return a verdict for the nonmoving party. Community Enterprises' motion for summary judgment on issue of whether Edward's position falls within the companionship services exemption is denied.

### State Minimum Wage and Overtime Claims

In count one of her complaint, Edwards also alleges a violation of state minimum wage and overtime laws, codified at Connecticut General Statutes § 31–58, *et seq.* Like the FLSA, the minimum wage and maximum hour provisions of the Connecticut General Statutes only apply to "employees." Conn. Gen.Stat. § 31–60(a). Section 31–60 of the Connecticut General Statutes provides that "[a]ny employer who pays or agrees to pay to an employee less than the minimum fair wage or overtime wage shall be deemed in violation of the provisions of this part." Edwards and Community Enterprises both moved for summary judgment on the issue of whether she constitutes an employee for purposes of the Connecticut General Statutes.

Section 31–58(f) of the Connecticut General Statutes states that:

"Employee" means any individual employed or permitted to work by an employer but shall not include any individual employed in ... domestic service employment as defined in the regulations of the federal Fair Labor Standards Act ... or any individual engaged in the activities of an educational, charitable, religious, scientific, historical, literary or non-profit organization where the employer-employee relationship does not, in fact, exist or where the services rendered to such organizations are on a voluntary basis.

Unlike the FLSA, which exempts domestic services from the minimum wage and maximum hour requirements, the Connecticut General Statutes provide that persons providing domestic service, as defined under the FLSA, are not "employees." Accordingly, the issue of whether Edwards was an employee turns on whether Edwards was "employed in domestic service employment to provide companionship services," as defined in the FLSA. As discussed above, a reasonable jury could come down on either side of the question of whether the apartment shared by Edwards and BJP was a private residence. The court therefore denies all motions for summary judgment on Edwards' state claims.

### The FMLA Claim

■ Count two of Edwards' complaint alleges a violation of the FMLA. Like the FLSA, the FMLA only applies to "eligible employees." 29 U.S.C. § 2612. The FMLA adopted the FLSA's definitions of "employee" and "employ." 29 U.S.C. § 2611 ("The terms 'employ', 'employee', and 'State' have the same meanings given such terms in subsections (c), (e), and (g) of section 3 of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(c), (e), and (g))."). To make out a prima facie case for retaliation under the FMLA, Edwards must demonstrate that: (1) she availed herself of a protected right under the

FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and Community Enterprise's adverse employment action.

Community Enterprises argues that it is entitled to summary judgment on Edwards' FMLA claim because Edwards is not an employee within the meaning of the FLSA and because Edwards has failed to make out a prima facie case of retaliation. As discussed above, Edwards does constitute an employee for purposes of the FLSA, and therefore, Community Enterprises' first argument fails. For the following reasons, Community Enterprises' second argument in support of summary judgment on the FMLA claim also fails.

■ Community Enterprises argues that Edwards has not met the first element because "Plaintiff has not presented any evidence to show that she requested a 'leave' or that she attempted to avail herself of any other rights protected under the statute." It is clear that Edwards' FMLA claim does not fail for lack of notice. Community Enterprises' argument on this issue simply lacks any merit in light of the plain meaning of the statute, the case law, and Community Enterprises' admission that "it was Defendant that first encouraged her to seek treatment" for pneumonia. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 12.) When the need for medical leave is unforeseeable, the FMLA only requires such notice as is practicable. Section 2612(e)(1) provides that "[i]n any case in which the necessity for leave under subparagraph (C) or (D) of subsection (a)(1) is foreseeable based on planned medical treatment, the employee ... shall provide the employer with not less than 30 days' notice, before the date the leave is to begin ..., except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide

such notice as is practicable." The case law supports the FMLA text. *See Johnson v. Primerica*, 1996 WL 34148, **4–5, 1996 U.S. Dist. LEXIS 869, *14 (S.D.N.Y. Jan. 30, 1996) ("[A]n employee's need to take qualifying leave will not be precluded by an inability to give notice to the employer in advance."). Finally, Community Enterprises has admitted that it had such notice as was practicable by admitting that it first encouraged Edwards to seek treatment.

■ It is similarly clear that Edwards availed herself of rights protected under the statute. The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period ... because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. Edwards' illness was sufficiently severe to warrant a trip to the emergency room, a fact that Community Enterprises recognized and acknowledges. Following her doctor's advice, Edwards took fourteen days off work to recuperate, and the "[d]efendant never considered Plaintiff's absence from the apartment due to her illness to be a problem." (Mem. in Supp. of Def.'s Mot. for Summ. J. at 12.) The FMLA "does not require an employee to invoke the language of the statute to gain its protection when notifying her employer of her need for leave for a serious health condition." *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir.1995).

■ Community Enterprises also argues that Edwards has failed to establish a causal connection between her termination and her leave of absence. Community Enterprises argues that the evidence "demonstrates that Defendant had already made the decision to ask Plaintiff to leave the program prior to her illness or any absences related thereto, and contradicts Plaintiff's claim of retaliatory discharge in violation of the FMLA." (Mem. in Supp. of Def.'s Mot. for Summ. J. at 24.) Edwards, however, has produced sufficient evidence, albeit circumstantial evidence, for a reasonable jury to find that Community Enterprises fired her because of her leave of absence. Prior to her termination, Edwards had never been disciplined, and Community Enterprises exercised strict control over her leave, in some cases denying her requests for leave. Edwards returned to work on January 26, 2000 and was terminated two days later. From the close proximity of these events, a reasonable jury could infer a causal relationship. Community Enterprises argues that its true motivation was Edwards' improper act of cashing BJP's rent subsidy check and that it only delayed firing Edwards because she got sick. (Suiter 176–77). Nevertheless, in light of the absence of a written policy, Edwards' previously unblemished employment record, Community Enterprises' failure to terminate her prior to her illness, and the abrupt manner in which Suiter removed Edwards from her apartment, a reasonable jury could find that Community Enterprises fired Edwards because she took leave. Accordingly, the court holds that whether there is a causal connection between the adverse employment action and Edwards' exercise of her rights under the FMLA is a material issue of fact for the jury.

### Intentional infliction of emotional distress

■ To prevail on a claim of intentional infliction of emotional distress, Edwards must show that: (1) Community Enterprises intended to inflict emotional distress or that it knew or should have known that emotional distress would likely result from its conduct; (2) Community Enterprises' conduct was extreme and outrageous; (3) Community Enterprises' conduct was the cause of Edwards' distress; and (4) Ed-

wards' emotional distress was severe. *Murray v. Bridgeport Hosp.*, 40 Conn. Supp. 56, 62, 480 A.2d 610 (1984).

■ "Whether the defendant's actions were extreme or outrageous . . . is a question of fact." *Murray*, 40 Conn.Supp. at 62, 480 A.2d 610. However, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . ." *Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. 17 n. 1, 597 A.2d 846 (Conn.Super.1991). Only where reasonable minds could differ does it become a question for the jury. *Id.; see also Johnson v. Chesebrough–Pond's USA Co.*, 918 F.Supp. 543, 552 (D.Conn.1996).

■ Liability for intentional infliction of emotional distress requires "conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis v. New Haven*, 220 Conn. 225, 267, 597 A.2d 807 (1991) (internal quotation marks and citation omitted). Edwards was given approximately 48 hours from the time she was notified of her termination to move out of her apartment. When she protested that she had paid rent through the end of the month, Suiter threatened to have the police evict her. Edwards had to move in with her daughter and file for unemployment compensation, requiring her to reveal that she had been fired for stealing. Although Community Enterprises' conduct may not be commendable, it clearly falls short of being outrageous. Because reasonable minds could not differ on this issue, the court declines to address the other three elements of the claim and grants Community Enterprises' motion for summary judgment on Edwards' claim for intentional infliction of emotional distress.

*Negligent infliction of emotional distress*

■ To prove a claim of negligent infliction of emotional distress, Edwards must establish that Community Enterprises "knew or should have known that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily injury." *Buckman v. People Express, Inc.*, 205 Conn. 166, 173, 530 A.2d 596 (1987). In the employment context, liability for negligent infliction of emotional distress can arise only for conduct in the termination process. *Parsons v. United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) ("[N]egligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process."). The Connecticut Supreme Court has also held that "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior," and therefore is not enough, by itself, to "sustain a claim for negligent termination of employment." *Id.* at 88–89, 700 A.2d 655 (internal quotation marks and citation omitted).

■ Given that Suiter knew Edwards was recovering from pneumonia, gave Edwards just 48 hours to vacate her home in January, and threatened to have the police evict her, a reasonable jury could possibly find that Community Enterprises knew or should have known that its conduct involved an unreasonable risk of causing emotional distress and that such distress could result in illness or bodily injury. The conduct in question arose from the termination process, and the claim is based on the aggravating circumstances of the termination, not the mere fact that Edwards was terminated. Although Edwards did not see any physicians or psychiatrists as a result of the alleged emo-

tional damage (Edwards Dep. at 124), she could still recover general emotional damages. Accordingly, Community Enterprises' motion to for summary judgment Edwards' claim for negligent infliction of emotional distress is denied.

### Defamation

 To prove that Community Enterprises is liable for defamation, Edwards must establish that Community Enterprises published false statements that harmed her, and that the defendants were not privileged to do so. *Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1, 27, 662 A.2d 89 (1995). "It is a well established principle that an accusation of theft is slander per se." *DeVito v. Schwartz*, 66 Conn.App. 228, 234, 784 A.2d 376 (2001) (citing *Ventresca v. Kissner*, 105 Conn. 533, 537, 136 A. 90 (1927)). "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it." *Battista v. United Illuminating Co.*, 10 Conn.App. 486, 492, 523 A.2d 1356 (1987). Suiter acknowledges that she may have told BJP's father that Plaintiff had stolen money from BJP. (Suiter 162–63, 169–70). Calvert overheard the conversation and could not recall whether Suiter had used the word "steal." (Calvert 59–60). Although the claim is not compelling, a reasonable jury could find that Edwards had been slandered. Accordingly, Community Enterprises' motion for summary judgment on the defamation count is denied.

### CONCLUSION

For the aforementioned reasons, the Plaintiff's motion for summary judgment (Dkt. No. 27) is granted in part and denied in part. It is granted on the issues of (1) whether Edwards constitutes an "employee" for purposes of the FLSA and FMLA, and (2) whether Community Enterprises constitutes an "enterprise" for purposes of the FLSA. Plaintiff's motion is denied on the issue of whether Edwards constitutes an "employee" under the Connecticut General Statutes. The Defendant's motion for summary judgment (Dkt. No. 30) is granted in part and denied in part. The Defendant's motion is granted with respect to Count Three of the Complaint, alleging intentional infliction of emotional distress. The Defendant's motion for summary judgment is denied in all other respects.

So ordered.